Michael A. Sirignano (MS 5263)
Barry I. Levy (BL 2190)
Ryan Goldberg (RG 7570)
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs, Government Employees Insurance
Co., GEICO Indemnity Co., GEICO General Insurance
Company and GEICO Casualty Co.*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

|  |  |
|---|---|
| GOVERNMENT EMPLOYEES INSURANCE CO., GEICO INDEMNITY CO., GEICO GENERAL INSURANCE COMPANY and GEICO CASUALTY CO., | |
| Plaintiffs, | 14-cv-3775<br>Docket No.:_____ (      ) |
| -against- | |
| LEONID SIMAKOVSKY, D.C., | **Plaintiff Demands a Trial by Jury** |
| -and- | |
| PUGSLEY CHIROPRACTIC, P.L.L.C., CANON CHIROPRACTIC CARE, P.C., | **COMPLAINT** |
| -and- | |
| ANDREY ANIKEYEV, ALEXANDER SANDLER, and JOHN DOE DEFENDANTS 1 – 5 | |
| Defendants. | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General

Insurance Company and GEICO Casualty Co. (collectively "GEICO" or "Plaintiffs"), as and for

their Complaint against the Defendants, hereby allege as follows:

## NATURE OF THE ACTION

1.      This action seeks to recover more than $1,395,000.00 that the Defendants have wrongfully obtained from GEICO through submission of fraudulent chiropractic no-fault claims under the names of Canon Chiropractic PC and Pugsley Chiropractic PLLC.   The fraud perpetrated against GEICO involves a chiropractor, two phony chiropractic professional corporations, and two non-chiropractic laypersons, Andrey Anikeyev ("Anikeyev") and Alexander Sandler ("Sandler"), who spearheaded the scheme by virtue of their secret and unlawful ownership of the two chiropractic professional corporations that submitted millions of dollars in fraudulent billing to GEICO.

2.      The non-chiropractic laypersons, Anikeyev and Sandler, who already have pled guilty to a substantial part of this scheme, recruited a licensed chiropractor, Leonid Simakovsky ("Simakovsky"), who was willing to "sell" his name and license to them, so that Anikeyev, Sandler and other laypersons could illegally control the chiropractic "practices" and siphon all of the revenues that were generated by the billings submitted to GEICO and other insurers to themselves.

3.      The fraudulent scheme can be summarized as follows:

    (i)      unlicensed non-chiropractors purchased the use of a chiropractor's license for a nominal sum or some ongoing payment, then used the chiropractor's license to fraudulently incorporate two professional corporations, Canon Chiropractic Care, P.C. ("Canon") and Pugsley Chiropractic, P.L.L.C. ("Pugsley")(collectively the "PC Defendants");

    (ii)      though the professional corporations nominally were owned on paper by the chiropractor, they actually were secretly owned and controlled by the unlicensed non-chiropractors;

    (iii)      the professional corporations were phony chiropractic practices in that the alleged chiropractor-owner never even engaged in the practice of chiropractic through the professional corporations as an owner of the "practices."

2

(iv) the professional corporations served as vehicles through which fraudulent no-fault claims were submitted to GEICO and other New York automobile insurers for chiropractic services allegedly provided to individuals involved in automobile accidents in New York ("Insureds");

(v) the non-chiropractors established "management," "billing," and/or "collection" agreements to create the facade of business relationships with the professional corporations, but actually used the "management," "billing," and/or "collection" agreements to unlawfully own and control the professional corporations, and then siphon off the resulting insurance payments to themselves, in contravention of New York law.

(vi) the chiropractic services were provided – to the extent that they were provided at all – pursuant to illegal kickback arrangements among the Defendants and others; and

(vii) in many cases, the purported chiropractic services were performed by independent contractors but were fraudulently billed to GEICO and other insurers as if they were performed by the professional corporations' employees.

4. Accordingly, in addition to seeking more than $1,395,000.00 that the Defendants have wrongfully obtained from GEICO through fraudulent no-fault claims, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of more than $510,000.00 in pending fraudulent claims that have been submitted, or caused to be submitted, by the Defendants through the PC Defendants because:

(i) the PC Defendants have no right to receive payment for any pending bills submitted to GEICO because the professional corporations were fraudulently incorporated, owned and/or controlled by non-chiropractors, and illegally operating;

(ii) the PC Defendants have no right to receive payment for any pending bills submitted to GEICO because the professional corporations engaged in unlawful fee-splitting with non- chiropractors;

(iii) the chiropractic services were provided – to the extent that they were provided at all – pursuant to illegal kickback arrangements among the Defendants and others;

(iv)    the professional corporations are chiropractic practices nominally owned by a chiropractor but the chiropractor has never engaged in the practice of chiropractic through the professional corporations as an owner of the practices; and

(iii)    the PC Defendants have no right to receive payment for any pending bills submitted to GEICO because in many instances the chiropractic services billed were not provided by individuals employed by the professional corporations.

5.    The Defendants fall into the following categories:

(i)    Defendants, Canon Chiropractic Care, P.C. ("Canon") and Pugsley Chiropractic, P.L.L.C. ("Pugsley") are the "PC Defendants" and fraudulently incorporated New York chiropractic professional corporations, through which the chiropractic services purportedly were performed and billed to insurance companies, including GEICO.

(ii)    Defendant, Leonid Simakovsky ("Simakovsky") is the "Nominal Owner" and a chiropractor licensed to practice in the State of New York who falsely purports to own the PC Defendants.

(iii)    Defendants Andrey Anikeyev ("Anikeyev") and Alexander Sandler ("Sandler") are unlicensed, non-chiropractors who actually own and control the PC Defendants in violation of New York law.

(iv)    John Does "One" through "Five" are individuals and entities, who are presently not identifiable but associated with Anikeyev, Sandler and the PC Defendants, who are not licensed chiropractors, but who truly own and control the PC Defendants with Anikeyev and Sandler in violation of law.

6.    The Defendants' scheme began in or about 2007 and has continued uninterrupted since that time.  To implement their fraudulent scheme, Anikeyev, Sandler and John Does "One" through "Five" (collectively, the "Management Defendants") recruited a licensed chiropractor, who was willing to sell his license to the Management Defendants so as to permit them to unlawfully incorporate the PC Defendants, and use the facade of the professional corporation to generate large scale fraudulent billing for chiropractor services to insurers.

7.    As discussed below, the Defendants at all relevant times have known that: (i) the PC Defendants were owned and controlled by non-chiropractors, not the nominal owner; (ii) the

PC Defendants split fees with non-chiropractors in contravention of New York law; (iii) the nominal owner of the PC Defendants did not practice through the professional corporations as an owner of the corporations; (iv) the chiropractic services were provided pursuant to illegal kickback arrangements among the Defendants and others; and (v) in many cases, the chiropractic services were performed by independent contractors but fraudulently billed to GEICO as if they were performed by the professional corporations' employees.

8.      Even so, every NF-3 or HCFA-1500 form (i.e. bill) mailed to GEICO misrepresented and/or concealed material facts regarding the assertion that the PC Defendant was properly licensed, and therefore, eligible to receive no-fault benefits pursuant to Insurance Law §5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12).   The NF-3's and HCFA-1500 forms further misrepresented and/or concealed the facts that the billed-for services were performed by independent contractors.  As such, the PC Defendants did not now have, and never had, any right to be compensated for the bills submitted through them to GEICO and to other New York automobile insurers.

9.      The chart annexed hereto as Exhibits "1" and "2" summarize, in part, the fraudulent claims identified to date that the Defendants submitted, or caused to be submitted, to GEICO through the PC Defendants.

**THE PARTIES**

**I.      Plaintiffs**

10.      Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co., are all Maryland corporations with their

principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue policies of automobile insurance in the State of New York.

## II.  **Defendants**

11.    Defendant Simakovsky is a chiropractor who has been licensed to practice in New York since February 10, 1997, and serves as the nominal or "paper" owner of Canon and Pugsley. Simakovsky resides in and is a citizen of New York.

12.    Defendant Canon is a New York chiropractic professional corporation with its principal place of business in New York. Pugsley was fraudulently incorporated in New York on or about August 1, 2007, is owned on paper by Simakovsky, but in actuality is owned and controlled by unlicensed, uncertified non-chiropractors in contravention of New York law. Canon is a technically an inactive corporation under New York State law, dissolved by proclamation dated January 25, 2012.

13.    Defendant Pugsley is a New York chiropractic professional corporation with its principal place of business in New York. Pugsley was fraudulently incorporated in New York on or about June 30, 2008, is owned on paper by Simakovsky, but in actuality is owned and controlled by unlicensed, uncertified non-chiropractors in contravention of New York law.

14.    Defendant Anikeyev resides in and is a citizen of the State of New Jersey. Anikeyev never has been a licensed or certified chiropractor, yet has secretly owned, controlled, and derived economic benefit from the PC Defendants in contravention of New York law.

15.    Defendant Sandler resides in and is a citizen of the State of New Jersey. Sandler never has been a licensed or certified chiropractor, yet has secretly owned, controlled, and derived economic benefit from the PC Defendants in contravention of New York law.

16.     Defendants John Does "One" through "Five" reside in and are citizens of the State of New York and or New Jersey.  John Does "One" through "Five" are individuals and entities, who are presently not identifiable but associated with the PC Defendants, Anikeyev, and Sandler and who have secretly owned, controlled, and derived economic benefit from the PC Defendants in contravention of New York law.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.  Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act because they arise under the laws of the United States.  In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

18.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

**I.**     **An Overview of the No-Fault Laws and Licensing Statutes**

19.     GEICO underwrites automobile insurance in New York.

20.     New York's No-Fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need.  Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y.

Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.)(collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

21.     No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for health care goods and services.

22.     An Insured can assign his or her right to No-Fault Benefits to the providers of healthcare services in exchange for those services.  Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company within forty-five days of the date of service and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or more commonly as an "NF-3"). In the alternative, a healthcare provider may submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 Form").

23.     The No-Fault Laws obligate individuals and healthcare providers that seek payment of No-Fault Benefits to provide insurers with additional verification in order to establish proof of their claims.

24.     The prescribed No-Fault policy endorsement set forth in 11 N.Y.C.R.R. § 65-1.1 provides, in pertinent part, that "[u]pon request by the Company, the eligible injured person or that person's assignee . . . shall … (b) as may reasonably be required, submit to an examination under oath by any person named by the Company, and shall subscribe to same . . . , and (d) provide any other pertinent information that may assist the Company in determining the amount that is payable."

25.     Pursuant to the No-Fault Laws, professional corporations are not eligible to bill for or collect No-Fault Benefits if they are fraudulently incorporated. In New York, only a licensed physician (or chiropractor as the case may be) may: (i) practice medicine (or chiropractic); (ii) own or control a professional corporation authorized to practice medicine (or chiropractic); (iii) employ or supervise other physicians (or chiropractors); and (iv) derive economic benefit from physician (or chiropractic) services.  In New York, unlicensed laypersons may not: (i) practice medicine or chiropractic; (ii) own or control a professional corporation authorized to practice medicine or chiropractic; (iii) employ or supervise physicians or chiropractors; or (iv) derive economic benefit from physician or chiropractic services.

26.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals made clear that healthcare providers that fail to comply with licensing requirements are ineligible to collect No-Fault Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.

27.     Pursuant to the No-Fault Laws, health care service providers are not eligible to receive No-Fault Benefits if they engage in fee-splitting, which is prohibited by, inter alia, New York's Education Law and is a material component of state licensing laws for healthcare professionals.

28.     Additionally, New York law requires that the shareholders of a professional corporation be engaged in the practice of the profession through the professional corporation in order for it to be lawfully licensed. Under the No-Fault Laws, professional corporations are not eligible to receive No-Fault Benefits if they are owned by physicians/acupuncturists, etc., who do not engage in the practice of their profession through the professional corporation.

29.     The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12), provides, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet <u>any</u> applicable New York State or local licensing requirement necessary to perform such service in New York … (emphasis supplied).

30.     Pursuant to the No-Fault Laws, only health care providers in possession of a direct assignment of benefits are entitled to bill for or collect No-Fault Benefits. There is both a statutory and regulatory prohibition against payment of No-Fault Benefits to anyone other than the patient or his/her healthcare provider. The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.11, provides, in pertinent part, as follows:

> An insurer shall pay benefits for any element of loss …. <u>directly</u> to the applicant or, … upon assignment by the applicant …. shall pay benefits <u>directly</u> to providers of health care services as covered under section five thousand one hundred two (a)(1) of the Insurance Law… . (emphasis supplied).

31.     For a healthcare provider to be eligible to bill for and to collect charges from an insurer for chiropractic services pursuant to N.Y. Ins. Law § 5102(a), it must be the actual provider of the service. Under the No-Fault Laws, a professional service corporation is not eligible to bill for services, or to collect for those services from an insurer, where the services were rendered by persons who are not employees of the professional corporation, such as independent contractors.

32.     Pursuant to N.Y. Ins. Law § 403, all bills submitted by a healthcare provider to GEICO and all other insurers must be verified by the healthcare provider subject to – in substance – the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading,

information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime … .

## II. The Fraudulent Incorporation and Operation of the PC Defendants and the Management Defendants' Admissions of Fraud

### A. Overview of Defendants Fraudulent Scheme

33.     Beginning in 2007, Defendants have carried out a fraudulent scheme in which the PC Defendants, owned on paper by Simakovsky, but actually illegally owned and controlled by non-chiropractors – have been used to bill the New York automobile insurance industry millions of dollars that they never were eligible to receive.

34.     As set forth in detail below, the Management Defendants recruited Simakovsky to essentially "sell" his license to them so that they could fraudulently incorporate the professional corporations and use them to submit large-scale fraudulent billing to insurers.  Simakovsky barely even acted as an employee, as Simakovsky virtually never rendered services through the PC Defendants.  True ownership and control of the PC Defendants rested at all times entirely with the Management Defendants, who used the façade of the professional corporation to do indirectly what they are forbidden from doing directly, namely: (i) employing chiropractors;  (ii) controlling the chiropractic practices; and (iii) charging for and deriving an economic benefit from the chiropractors' services.

35.     The Management Defendants organized the PC Defendants to operate on a transient basis to provide a range of chiropractic services to Insureds at various locations, through a network of medical "clinics" located throughout the New York City area (the "No-Fault Medical Mills"), where each Insured was subjected to a cookie-cutter pattern of predetermined treatment.  In exchange for payment of fees for referrals and/or kickbacks to the owners of the No-Fault Medical Mills, the Management Defendants gained access to the patients

of these No-Fault Medicals Mills, which in turn permitted Defendants to bill for purported chiropractic services under the name of the PC Defendants.

36.     The No-Fault Medical Mills where the PC Defendants operated provided a steady stream of patients to the PC Defendants through the use of "runners" and other illegal financials arrangements.  Defendants knew and understood that they could only gain access to the No-Fault Medical Mills and their steady stream of patients generated through "runners" and other illegal financial arrangements if they paid financial incentives and kickbacks to the owners and controllers of the No-Fault Medical Mills, and other laypersons supplying patients, who were involved in the scheme with the Management Defendants.

37.     The kickbacks that the Defendants paid were disguised as ostensibly legitimate fees to "rent" space or personnel, management agreements, marketing agreements, transportation fees and/or other sham agreements.  In fact, these were actually "pay-to-play" arrangements that caused the No-Fault Medical Mills to provide access to Insureds and to steer the Insureds to the PC Defendants for the medically unnecessary chiropractic treatment, with the amount of the payments based upon the volume of Insureds that were referred to the PC Defendants for "treatment."

     B.     The Management Defendants Guilty Pleas and Admissions of Health Care Fraud

38.     Both Anikeyev and Sandler have pled guilty in 2013 to their roles in this fraudulent scheme and their admissions show they acted as spearheads of the fraud.

39.     On or about February 29, 2012, a federal indictment (the "February 2012 Indictment") was unsealed in the United States District Court for the Southern District of New York.  The February 2012 Indictment charged Anikeyev, Sandler (and many others), with two or more crimes, including RICO Conspiracy, Conspiracy to Commit Health Care Fraud, Conspiracy

to Commit Mail Fraud and Conspiracy to Commit Money Laundering, committed in connection with a massive scheme to defraud New York automobile insurance companies of more than $279 million under New York's no-fault insurance laws.  See United States v. Zemlyansky, 12-CR-00171 (SDNY 2012) (the "Zemlyansky Action").

40.     The February 2012 Indictment averred that Anikeyev and Sandler participated in a vast RICO criminal enterprise whereby non-professionals controlled healthcare providers (akin to the allegations in this case) by paying licensed medical practitioners (including chiropractors) to use their licenses to incorporate the professional corporations; paid kickbacks to runners who recruited automobile accident passengers to receive medically unnecessary treatments from the no-fault clinics; and instructed the clinic owners to prescribe excessive and unwarranted referrals for various "modality treatments" for every patient they saw.  See Exhibit "3."

41.     During the Zemlyansky Action, the United States Attorney filed papers in the action setting forth a list of fraudulently incorporated professional corporations set up by the defendants "for the sole purpose of defrauding insurance companies in the State of New York." According to the United States Attorney's list, both PC Defendants were identified as professional corporations associated with Anikeyev and Sandler and used in furtherance of the fraudulent scheme to defraud insurance companies.  A copy of the Government's October 26, 2012 Opposition, with attached list of the PCs used to commit fraud, is annexed hereto as Exhibit "4."

42.     The February 2012 Indictment, supplemented by the United States Attorney's October 26, 2012 list of fraudulently incorporated professional corporations that were used in the insurance fraud, alleges facts indicating that:

- The PC Defendants were owned "on paper" by Simakovsky as a sham, but in actuality were truly owned and controlled by Anikeyev and Sandler.

- Anikeyev and Sandler paid kickbacks to referring healthcare clinics in exchange for which the referring healthcare clinics referred patients for medically unnecessary services.

- Anikeyev and Sandler– rather than the nominal owner (Simakovsky) – received most, if not all, of the profits from the PC Defendants.

Id.

43.     On March 15, 2013, Anikeyev pled guilty to one count of conspiracy to commit health care and mail fraud and he agreed that as to the other counts against him he was not a "prevailing party."  Copies of the Information and Anikeyev's guilty pleas in the Zemlyansky Action are annexed hereto collectively as Exhibit "5."  During his allocution, Anikeyev admitted that from 2008 to 2012 he "agreed with others to commit health care and mail fraud" and "submitted bills through mail…for…services I knew were false…these bills requested payments for health care services for time periods in excess of the actual time period the patient spent." Id.

44.     Anikeyev's plea agreement also provides for forfeiture of all property "from the gross proceeds traceable to the commission of the offense charged…including but not limited to the sum of $4,102,273.67…including all funds seized" from the corporate accounts of five acupuncture corporations he illegally owned and controlled.  See Exhibit "5."

45.     In papers filed by Anikeyev in support of his sentencing and in opposition to government motions, Anikeyev admitted to operating a medical billing company which was responsible for submitting bills to insurance companies.  This billing company was the vehicle through which the fraudulent bills were provided to GEICO.  See Affidavit annexed hereto as Exhibit "6".

46.     Anikeyev was sentenced to a multi-year prison sentence in connection with the Government's criminal proceedings brought in the Zemlyansky Action.

47.     Like Anikeyev, on March 8, 2013, Sandler pled guilty to one count of conspiracy to commit health care and mail fraud.  Copies of the Information and Sandler's guilty pleas in the <u>Zemlyansky</u> Action are annexed hereto collectively as Exhibit "7."  During his allocution, Sandler admitted that from 2007 to 2012 he agreed with others "to own and operate medical clinics that were incorporated by doctors against New York law."  Sandler further admitted, "And I knowingly misrepresented to insurance companies that the doctors owned the clinics so I could obtain no-fault payments." <u>Id</u>.

48.     Sandler's plea agreement also provides for forfeiture of all property "from the gross proceeds traceable to the commission of the offense charged…including but not limited to the sum of $4,848.328.63. <u>See</u> Exhibit "7."

49.     Sandler was sentenced to a multi-year prison sentence in connection with the Government's criminal proceedings brought in the <u>Zemlyansky</u> Action.

50.     In addition to the Government's prosecution, the involvement by Anikeyev and Sandler in similar fraudulent no-fault schemes has been detailed in the past by civil fraud complaints filed by other insurance companies.

51.     For example, in 2010, Anikeyev was sued by State Farm in New York State Supreme Court (<u>State Farm v. Anikeyev</u>, et. al., Index No.: 4399/10 (Supreme Ct. Nassau Cty. 2010)), alleging that Anikeyev, a non-physician, illegally controlled, managed and operated numerous other acupuncture professional corporations, in contravention of New York law.  After nearly three years of litigation, Justice Steven Jaeger, among other things, struck defendants' answers, issued default judgment, and found that "the overwhelming evidence indicates that the PC Defendants were not owned and controlled by a licensed acupuncturist, thereby rendering them ineligible to receive reimbursement…" <i>Id</i>., April 29, 2013.  Some of the professional

corporations at issue in the State Farm litigation also were previously determined to be fraudulently incorporated and ineligible to seek reimbursement for their alleged acupuncture services during the course of AAA No-Fault arbitration proceedings.

52.     Similarly, in 2011, Anikeyev was sued, along with 20 professional corporations and thirteen nominal owners by GEICO in the United States District Court for the Eastern District of New York (GEICO v.  Razzakova., et al., CV 11-CV-4237 (FMB)(SMG)("Razzakova action").  During the course of the GEICO litigation, GEICO uncovered evidence that the PC Defendants engaged in money-siphoning and dissipation activities.  For example, checks from the PC Defendants filed in that case showed that most, if not all, of the 20 purportedly separate acupuncture PCs were making regular and substantial payments to illegal escort services/brothels in Brooklyn, New York, which had been indicted by the Kings County DA as part of a crime ring.  In addition, the PC Defendants in that case appeared to have been regularly funneling thousands of dollars per month to, among other suspect entities, a series of Florida companies with ties to Anikeyev, his relatives and his billing company.

53.     The Management Defendants, along with Simakovsky, also were named as defendants in an action brought by Allstate.  See Allstate v. Zemlyansky, et al, CV 12-2303 (JBW)(RER).  In the Allstate Action, Simakovsky is alleged to be the sham owner of additional chiropractic professional corporations that were identified by the Government as being owned and controlled by the Management Defendants.

**III.     The Fraudulent Incorporation of Operation of the PC Defendants**

54.     Although Simakovsky is listed as the nominal owner of the PC Defendants on their respective Certificates of Incorporation, he exercised no ownership or control over the chiropractic services provided or the profits generated from the PC Defendants.  Instead, the day-

to-day operations, supervisory control, and true ownership of the PC Defendants rested in the hands of the Management Defendants.

55.     The Management Defendants recruited Simakovsky who was willing to "sell" his license so that they could fraudulently incorporate the PC Defendants and use them to submit large-scale fraudulent billing to insurers.  Simakovsky was amenable to this agreement as he was in a relationship with an acupuncturist who served as the nominal owner of various professional corporations being illegally owned and controlled by Anikeyev, in another no-fault fraud scheme.

56.     In exchange for a designated salary or other form of compensation, Simakovsky agreed to falsely represent in the Certificates of Incorporation filed with the Department of Education, and the biennial statements filed thereafter, that he is the true shareholder, director and officer of Simakovsky and that he truly owns, controls and practices through the professional corporation.

57.     Once the PC Defendants were fraudulently incorporated on or about August 1, 2007 and June 30, 2008, respectively, Simakovsky ceded true beneficial ownership and control over the professional corporations to the Management Defendants, who then caused the PC Defendants to operate from numerous locations that housed other fraudulent medical providers. The PC Defendants did not have an internet websites or appear to advertise for patients; or advertise any of its locations, and did virtually nothing as would be expected of legitimate chiropractic "practices" to develop their reputation and attract patients.  In fact, the PC Defendants did not even identify the name of the purported owner on their letterhead.

58.     Despite purporting to be separate and independent chiropractic professional corporations, the PC Defendants never genuinely advertised for patients; never had internet websites; and never had patient bases of their own.

59.     Simakovsky likewise never genuinely advertised for patients; never sought to build up name recognition for the PC Defendants to draw business; and never made any legitimate effort to generate patients on his own for the PC Defendants.

60.     While Simakovsky purported, and continues to purport, to be the current sole shareholder of the PC Defendants, he: (i) virtually never personally provided chiropractic treatment to any of the patients of the PC Defendants; (ii) did not train or supervise the chiropractors working under the names of the PC Defendants who purported to provide treatment to patients; and (iii) did not invest any "start-up" monies out of his own pocket to create the "practices" operating under the names of the PC Defendants.

61.     Throughout the course of Simakovsky's relationship with the Management Defendants, all decision-making authority relating to the operation and management of the PC Defendants has been vested entirely with the Management Defendants.  This includes control over the treatment protocols for patients; the hiring of chiropractors who allegedly performed the services; the control over how the services would be billed to insurers, including GEICO; and how the profits of the PC Defendants were dispersed by the professional corporations.  In reality, Simakovsky never has been anything more than a de facto employee of the Management Defendants.

62.     The Management Defendants, in particular, caused the PC Defendants to utilize the same PO Box (PO Box 190111) owned and controlled by the Management Defendants, in order to be able to control the billing and finances of the professional corporations.

63.     The treating chiropractors were essentially employees of the Management Defendants and not of the PC Defendants.  The Management Defendants would then use their control over the PC Defendants to control the treatment and billing protocols in order to derive economic benefit from their services.

64.     Despite not being a licensed medical professional, Anikeyev is no stranger to this type of manipulation of treatment protocols.   For example, as admitted in his allocution, Anikeyev required various acupuncture professional corporations that he illegally controlled to submit fraudulent billing for services he knew were not rendered.  Anikeyev admitted to causing the various professional corporations to submit bills for service he knew were false, stating in his allocution "these bills requested payments for health care services for time periods in excess of the actual time period the patient spent with acupuncturists," and he did this "with the intent of obtaining money from various insurance companies." See Exhibit "5".

65.     Through records obtained in the Razzakova litigation, GEICO confirmed that the PC Defendants in this action – Canon and Pugsley - issued regular payments to the billing company owned and controlled by Anikeyev (a company he admitted to controlling in an Affidavit submitted in the Zemlyansky Action).  See Exhibit "6".

66.     During a site visit at one of Pugsley's treatment locations, a receptionist at one of the No-Fault Medical Mills advised GEICO to contact Pugsley at 718-676-7077, which is the phone number for the billing company owned and controlled by Anikeyev.   Likewise, the postage meter used by Pugsley is associated with this billing company and Anikeyev.

67.     GEICO also interviewed multiple treating chiropractors who purportedly rendered services at Pugsley based on bills submitted to GEICO, and they essentially confirmed that Simakovsky was not the true owner and operator of Pugsley.   For example, the treating

chiropractors stated: (i) paychecks came from the "billing company" and not from the owner of Pugsley; (ii) they were unaware of where Pugsley was physically located; (iii) the "billing company" picks up the bills and reports from the location; and (iv) they had not seen Simakovsky at the treatment locations.

68.     To conceal the illegal fee splitting, kickback, and referral relationships with the Management Defendants, while simultaneously effectuating pervasive, total control over the PC Defendants' operation and management, the Management Defendants arranged to have the PC Defendants and Simakovsky enter into purported "billing," "marketing," and "management" arrangements with them. This allowed for the Management Defendants to siphon off the profits of the PC Defendants.

69.     While the arrangements ostensibly were created to permit the Management Defendants to provide alleged billing, marketing and management services, they were actually used solely as a tool to permit them: (i) to control the day-to-day operations, exercise supervisory authority over, and illegally own the PC Defendants; and (ii) to siphon all of the profits that were generated by the billings submitted to GEICO and other insurers through the PC Defendants.

70.     The PC Defendants "treatments" also were provided at various locations which were known havens for the Management Defendants (and other defendants in the Zemlyansky Action) fraudulent activity. These locations, which have been a source of questionable ownership and fraudulent treatment and billing for years, include but are not limited to the following:

- 1310 Pugsley Avenue, Bronx, New York
- 1760A Eastern Parkway, Brooklyn, New York
- 3858 Nostrand Avenue, Brooklyn, New York
- 632 Flatbush Avenue, Brooklyn, New York
- 40-11 Warren Street, Queens, New York

- 153-25 Hillside Avenue, Queens, New York
- 140-40 Queens Boulevard, Queens, New York
- 931 Morris Park Avenue, Bronx, New York
- 2025 Davidson Avenue, Bronx, New York
- 1414 Utica Avenue, Brooklyn, New York

Most, if not all of these locations via the medical providers operating at these locations have been specifically identified by the Government as being used in furtherance of the massive No Fault fraud scheme in the criminal <u>Zemlyansky</u> case.  <u>See</u> Exhibit "4".

71.     The Management Defendants' handling of the billing and claims submissions allow them to maintain total control over the professional corporations, the accounts receivables, and any revenues that might be generated therefrom.  This entire scheme not only unlawfully enriched the Management Defendants, but compromised patient care as the Defendant PCs' operations have been subjected to the pecuniary interests of non-chiropractors as opposed to the independent medical judgment of the true chiropractor-owners.

## IV.     Simakovsky's Failure to Practice Medicine Through the PC Defendants

72.     N.Y. Business Corporation Law § 1507 makes clear that a physician shareholder of a medical professional corporation must be engaged in the practice of medicine through the professional corporation for it to be lawfully licensed. Section 1507 provides as follows:

> *Issuance of shares*
>
> A professional service corporation may issue shares only to individuals who are authorized by law to practice in this state a profession which such corporation is authorized to practice and who are or have been engaged in the practice of such profession in such corporation…or who will engage in the practice of such profession in such corporation within thirty days of the date such shares are issued.…All shares issued, agreements made, or proxies granted in violation of this section shall be void.

73.     Legislative history confirms that a medical professional corporation's putative physician-owner not only must be licensed to practice medicine but must also be engaged in the practice of medicine through the medical professional corporation.  For example, in commenting on the proposed amendment to Section 1507 in 1971, the State Education Department stated:

> This bill amends the Business Corporation Law in relation to the operation of professional service corporations.  While this bill allows more flexibility in the ownership and transfer of professional service corporation stock, it maintains the basic concept of restricting ownership to professionals working within the corporation.

74.     Similarly, the New York Department of State commented that:

> Section 1507 currently limits issuance of shares in such corporation to persons licensed by this State to practice the profession which the corporation is authorized to practice and who so practice in such corporation or a predecessor entity.
>
> The bill would add a third category of person eligible to receive stock, one who will practice such profession "within 30 days of the date such shares are issued."

75.     New York's Department of Health was of the same opinion, commenting that:

> The bill would amend Article 15 of the Business Corporation Law pertaining to professional service corporations to allow the issuance of shares of individuals who will engage in the practice of the profession within 30 days of the date such shares are issued, in addition to those presently so engaged…. (Emphasis added.)

Copies of the memoranda are annexed hereto as Exhibit "8."

76.     In keeping with the fact that Simakovsky was just a sham or nominal owner, Simakovsky never actually practiced through the PC Defendants as an owner of the professional corporation.

77.     In fact, Simakovsky did not personally treat or provide services to virtually any of the PC Defendants' hundreds of patients.

78.     Simakovsky did not supervise any of the treatment or services allegedly provided to the PC Defendants' patients.

79.     Simakovsky did not train any of the treating chiropractors that allegedly perform services for the PC Defendants' patients.

80.     In fact, virtually none of the thousands of charges that have been submitted through the PC Defendants to GEICO for reimbursement has been for services actually performed by Simakovsky.

81.     As noted above, at least two treating chiropractors advised GEICO that they never saw Simakovsky at the treatment locations after they were hired.

82.     In addition, of the thousands of bills submitted to GEICO by the Defendants, virtually none of them contain an actual signature from Simakovsky.

83.     Simakovsky did not review the bills prior to submitting them to GEICO and in fact, many of the bills submitted by Pugsley misspell the corporation's name, calling it "Pagsley Chiropractic." (emphasis added).

84.     Further, Simakovsky's failure to practice through the PC Defendants as an owner and the lay-person control is evident in the billing submitted to GEICO.   Despite purporting to render basic chiropractic treatment, for which there are a set number of CPT codes to utilize, the PC Defendants' billing routinely used improper CPT codes to reflect the services that were allegedly rendered.

85.     For example, the PC Defendants routinely submitted billing for "chiropractic management" under CPT code 99213.  CPT code 99213 is an evaluation and management code found in the New York State Workers' Compensation Fee Schedule but not found in the New York State Workers' Compensation Chiropractic Fee Schedule.   Despite the treatment notes reflecting an Insured receiving spinal manipulation treatment, the PC Defendants' billing under

CPT code 99213 reflects an "office or outpatient visit for the evaluation and management of an established patient," lasting typically 15 minutes.

86.     Simakovsky's failure to practice through the professional corporation is further evident by the fact that on at least a few occasions, Pugsley submitted what appears to be billing to GEICO *for acupuncture services*.  As Simakovsky did not review the bills or even sign them on behalf of Pugsley, it is no surprise that these errors occurred, especially in light of fact that Anikeyev's billing company (which controlled the acupuncture providers at the same locations) handled the billing for Pugsley.  See Exhibit "6".

87.     Likewise, as will be detailed below, despite being two separate and independent corporations, virtually all of the PC Defendants' initial chiropractic examination reports contain identical typographical errors, which are strikingly similar to typographical errors contained in initial acupuncture reports from acupuncture PCs illegally owned and controlled by Anikeyev. See GEICO v. Razzakova., et al., CV 11-CV-4237 (FMB)(SMG); Liberty Mutual v. Matskina., et al., CV 14-CV-1330 (BMC).

88.     In short, the PC Defendants were never eligible in the first instance to bill or receive payment for chiropractic services because Simakovsky never practiced through the professional corporations as an owner of the professional corporations.

**V.     The Fraudulent Billing for Services Provided by Independent Contractors**

89.     The Defendants' fraudulent scheme also included submission of claims to GEICO seeking payment for services performed by independent contractors. Under the No-Fault Laws, professional corporations are ineligible to bill for or receive payment for goods or services provided by independent contractors – the healthcare services must be provided by the professional corporations, themselves, or by their employees.

90.     Since 2001, the New York State Insurance Department consistently has reaffirmed its longstanding position that professional corporations are not entitled to receive reimbursement under the No-Fault Laws for healthcare providers performing services as independent contractors. See DOI Opinion Letter, February 21, 2001 ("where the health services are performed by a provider who is an independent contractor with the PC and is not an employee under the direct supervision of a PC owner, the PC is not authorized to bill under No-Fault as a licensed provider of those services"); DOI Opinion Letter, February 5, 2002 (refusing to modify position set forth in 2-21-01 Opinion letter despite a request from the New York State Medical Society); DOI Opinion Letter, March 11, 2002 ("If the physician has contracted with the PC as an independent contractor, and is not an employee or shareholder of the PC, such physician may not represent himself or herself as an employee of the PC eligible to bill for health services rendered on behalf of the PC, under the New York Comprehensive Motor Vehicle Insurance Reparations Act…"); DOI Opinion Letter, October 29, 2003 (extending the independent contractor rule to hospitals); See DOI Opinion Letter, March 21, 2005 (DOI refused to modify its earlier opinions based upon interpretations of the Medicare statute issued by the CMS.  Copies of the relevant DOI Opinion letters are annexed hereto as Exhibit "9".

91.     The Defendants used certain chiropractors that they knew would be amenable to the scheme.  The chiropractor's services were not exclusive to the PC Defendants.  Rather, each of the chiropractors purported to provide services for numerous other providers at various facilities while concurrently performing services for the PC Defendants.   In fact, at least one of the treating chiropractors admitted to using Anikeyev's billing company for her own chiropractic corporation, which operated out of the same locations as Pugsley.

92.    The Defendants have, at all times, treated the chiropractors who performed the chiropractic services as independent contractors, rather than as employees of the PC Defendants.

93.    For instance, the Management Defendants:

(i)     paid the chiropractors, either in whole or in part, on a 1099 basis rather than a W-2 basis;

(ii)    established an understanding with the chiropractors that they were independent contractors, rather than employees;

(iii)   paid no employee benefits to the chiropractors;

(iv)    failed to secure and maintain W-4 or I-9 forms for the chiropractors;

(v)     failed to withhold federal, state or city taxes on behalf of the chiropractors;

(vi)    compelled the chiropractors to pay for their own malpractice insurance at their own expense;

(vii)   permitted the chiropractors to set their own schedules and days on which they desired to perform services;

(viii)  permitted the chiropractors to maintain non-exclusive relationships and perform services for their own practices and/or on behalf of other practices; and

(ix)    failed to cover the chiropractors for either unemployment or workers' compensation benefits.

94.    By electing to treat the chiropractors as independent contractors, the Defendants realized significant economic benefits – for instance:

(i)     avoiding the obligation to collect and remit income tax as required by 26 U.S.C. § 3102;

(ii)    avoiding payment of the FUTA excise tax required by 26 U.S.C. § 3301 (6.2 percent of all income paid);

(iii)   avoiding payment of the FICA excise tax required by 26 U.S.C. § 3111 (7.65 percent of all income paid);

(iv)    avoiding payment of workers' compensation insurance as required by New York Workers' Compensation Law § 10;

(v)     avoiding the need to secure any malpractice insurance; and

(vi)    avoiding claims of agency-based liability arising from work performed by the chiropractors.

95.     Because the chiropractors are independent contractors and performed the chiropractic services, the Defendants never had any right to bill for or collect No-Fault Benefits in connection with those services.

96.     The Defendants billed for the chiropractic services as if they were provided by actual employees of the PC Defendants to make it appear as if the services were eligible for reimbursement. The Defendants' misrepresentations were consciously designed to mislead GEICO into believing that it was obligated to pay for these services, when in fact GEICO was not.

**IV.        The Defendants' Bogus Treatment and Billing Protocol**

97.     In addition to controlling the operations, finances, and management of the PC Defendants, the Management Defendants controlled the treatment and billing protocols for the PC Defendants.  For example, the Management Defendants caused Pugsley to utilize boilerplate and virtually identical initial examination reports that did not change based on the patients' symptoms or diagnosis.  Virtually every report submitted to GEICO by the PC Defendants contained the same language regardless of which chiropractor performed the examination, and most importantly, regardless of the patients' particular symptoms and complaints.

98.     Showing a lack of chiropractic judgment and oversight, virtually every report submitted to GEICO contained the typographical errors in examination reports.  For example, virtually every initial examination contained the phrase, "it is my professional opinion that the patient's present condition is <u>casually</u> related to the incident described in this initial examination." (emphasis added).  Likewise, virtually every initial examination report contained

the phrase, "The <u>medication</u> of injuries is entirely consistent with the clinical presentation." (emphasis added).

99.     This type of erroneous paperwork is not surprising given the Management Defendants' control and operation of the PC Defendants.  In fact, similar typographical errors in initial acupuncture examination reports were found across 20 allegedly independent acupuncture professional corporations that were illegally owned and controlled by Anikeyev, including a virtually identical typographical error, in which the acupuncture examination reports substituted "<u>casual</u> relationship" (emphasis added) in place of causal relationship.  <u>See e.g.</u> <u>Liberty Mutual v.  Matskina., et al.,</u> CV 14-CV-1330 (BMC), *Docket No. 1, Exhibit "26"*; <u>GEICO v. Razzakova., et al.,</u> CV 11-CV-4237 (FMB)(SMG), *Docket No. 1.*

100.     Additionally, virtually all the PC Defendants' initial examination reports are prepared on a form which only listed the name of the professional corporation and no other information.  At best, the initial examination report might contain the address of the treatment location, but that is not standard across the PC Defendants' reports.  Copies of virtually identical initial examination reports are annexed hereto as Exhibit "10."

101.     Upon receiving a referral pursuant to the kickbacks paid to the Clinics, the PC Defendants purported to provide many of the Insureds with an initial chiropractic examination. Based on results of these boilerplate pre-determined examinations, virtually each insured is referred for chiropractic treatment at a rate of three times per week for four weeks.  This recommendation is made regardless of the individual patient's symptoms or conditions.

102.     As Anikeyev admitted during his allocution, through his billing company, he caused various professional corporations to submit billing that misrepresented the nature and extent of the treatments that actually were provided.  These misrepresentations, which continued

with the billing submitted by the PC Defendants, were plainly part of a pre-determined, fraudulent billing protocol imposed by Anikeyev and Sandler. See Exhibits "5" and "6".

## V.      The Fraudulent NF-3 Forms Submitted to GEICO

103.    To support the fraudulent healthcare charges, statutorily prescribed claim forms for No-Fault Benefits (i.e., NF-3 forms) consistently have been submitted to GEICO by and on behalf of the Defendants seeking payment for services for which the PC Defendants are ineligible to receive payment.

104.    The NF-3 forms submitted to GEICO by and on behalf of the PC Defendants are false and misleading in the following material respects:

(i)      The NF-3 forms uniformly misrepresent to GEICO that the PC Defendants are lawfully licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the PC Defendants are not properly licensed in that they are professional corporations that were fraudulently incorporated, have been owned and controlled by the Management Defendants, who are not chiropractors, and have been illegally operating.

(ii)     The NF-3 forms uniformly misrepresent to GEICO that the PC Defendants are lawfully licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the PC Defendants are not properly licensed in that they are professional corporations that engaged in unlawful fee splitting with the Management Defendants and others.

(iii)    The NF-3 forms uniformly misrepresent to GEICO that the PC Defendants are lawfully licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the PC Defendants are not properly licensed in that they are professional corporations that engaged in unlawful kickbacks arrangements.

(iv)     The NF-3 forms uniformly misrepresent to GEICO that the PC Defendants are lawfully licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the PC Defendants are not properly licensed in that they are professional corporations that are allegedly owned by a

chiropractor who did not practice on behalf of the professional corporations as owner of the corporations.

(v)     The NF-3 forms uniformly misrepresent to GEICO that the PC Defendants are eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.11 for chiropractic services that were performed. In fact, the PC Defendants are not eligible to seek or pursue collection of No-Fault Benefits associated with the chiropractic services because the services were not provided by employees of the PC Defendants but rather were performed by independent contractors.

## VI.   **Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance**

105.    The Defendants legally and ethically are obligated to act honestly and with integrity in connection with the billing that they submit, or caused to be submitted, to GEICO.

106.    To induce GEICO to promptly pay the fraudulent charges, the Defendants systematically have concealed their fraud and have gone to great lengths to accomplish this concealment.

107.    Specifically, the Defendants knowingly have misrepresented and concealed facts related to the PC Defendants in an effort to prevent discovery that the professional corporations are unlawfully incorporated, owned and controlled by non-chiropractic professionals and engaged in fee splitting, and therefore are ineligible to bill for or collect No-Fault Benefits.  For example, the Defendants misrepresented ownership of and control over the PC Defendants in filings with the New York State Department of Education, so as to induce the New York State Department of Education to issue the licenses required to permit chiropractic treatments to be practiced through the PC Defendants. Additionally, the Management Defendants entered into billing and financial arrangements with the PC Defendants that were designed to, and did, conceal their true ownership of and control over the PC Defendants, and the illegal fee splitting.

108.    Likewise, in every bill that the Defendants submitted or caused to be submitted to GEICO, the Defendants uniformly misrepresented that the PC Defendants properly were

incorporated, lawfully licensed, and eligible to bill for and collect No-Fault Benefits, when in fact they were not.

109. The Defendants created multiple professional corporations with different tax identification numbers in order to reduce the amount of billing submitted through any single professional corporation, thereby preventing GEICO from identifying all of the fraudulent professional corporations that were part of the coordinated scheme and/or the pattern of fraudulent charges submitted by any one entity.

110. In addition, in most of the bills that the Defendants submitted or caused to be submitted to GEICO, the Defendants uniformly misrepresented that the chiropractic services allegedly performed through the PC Defendants were performed by employees of the PC Defendants, when in fact they were performed by independent contractors.

111. The Defendants have hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely file expensive and time-consuming litigation against GEICO and other insurers if the charges are not promptly paid in full. In fact, even after Anikeyev's and Sandler's guilty pleas, the PC Defendants continue to have legal counsel pursue litigation against GEICO and other insurers without regard for the fact that the PCs have been engaged in fraud.

112. GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially-valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of more than $1,395,000.00 based upon the fraudulent charges representing payments made by GEICO on or after 2007.

113.    GEICO maintains standard office practices and procedures that are designed to and do ensure that No-Fault claim denial forms or requests for additional verification of No-Fault claims are properly addressed and mailed in a timely manner in accordance with the No-Fault Laws.

114.    In accordance with the No-Fault Laws, and GEICO's standard office practices and procedures, GEICO either: (i) timely denied the pending claims for No-Fault Benefits submitted through the PC Defendants; (ii) timely issued requests for additional verification with respect to the pending claims for No-Fault Benefits submitted through the PC Defendants, yet failed to obtain compliance with the request for additional verification; or else (iii) the time in which to deny the pending claims for No-Fault Benefits submitted through the PC Defendants, or else to request additional verification of those claims, has not expired.

115.    Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

## FIRST CAUSE OF ACTION
### Against All Defendants
### (Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)

116.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 114_ above.

117.    There is an actual case in controversy between GEICO and the Defendants, regarding more than $510,000.00 in fraudulent billing for healthcare services that has been submitted to GEICO.

118.    The PC Defendants have no right to receive payment for any pending bills submitted to GEICO because they are fraudulently incorporated, not truly owned by the Nominal

Owner Simakovsky, and are instead owned and controlled by the Management Defendants, who are not licensed acupuncturists, and, therefore, are ineligible to seek or recover No-Fault Benefits.

119.    The PC Defendants have no right to receive payment for any pending bills submitted to GEICO because they engaged in unlawful fee-splitting with the Management Defendants, who are not licensed chiropractors, and with others.

120.    The PC Defendants have no right to receive payment for any pending bills submitted to GEICO because they engaged in unlawful kickback arrangements with others in order to obtain their patient bases.

121.    The PC Defendants have no right to receive payment for any pending bills submitted to GEICO for chiropractic services because the services were provided by independent contractors and not employees of the PC Defendants.

122.    The PC Defendants have no right to receive payment for any pending bills submitted to GEICO for chiropractic services because the alleged owner of the PC Defendants did not practice through the professional corporations as an owner is required to do so.

123.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that:

> (i)      the PC Defendants have no right to receive payment for any pending bills submitted to GEICO because the professional corporations are fraudulently incorporated, not truly owned by the Nominal Owner, and instead owned and/or controlled by non-chiropractors and, therefore, are ineligible to seek or recover no-fault benefits;

> (ii)     the PC Defendants have no right to receive payment for any pending bills submitted to GEICO because the professional corporations engaged in unlawful fee-splitting;

> (iii)    the PC Defendants have no right to receive payment for any pending bills submitted to GEICO because the professional corporations engaged in unlawful kickback arrangements;

(iv)    the PC Defendants have no right to receive payment for any pending bills submitted to GEICO because the alleged owner of the professional corporations did not engage in the practice of chiropractic through the PC Defendants as an owner is required to do so;

(v)    the PC Defendants have no right to receive payment for any pending bills for chiropractic services submitted to GEICO because in many instances the chiropractic services billed were not provided by individuals employed by the professional corporations.

### SECOND CAUSE OF ACTION
### Against Simakovsky, Anikeyev, Sandler and John Does 1-5
### (Violation of RICO, 18 U.S.C. § 1962(c))

124.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 123 above.

125.    Canon Chiropractic Care, PC is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

126.    Simakovsky, Anikeyev, Sandler and John Does 1-5 knowingly have conducted and/or participated, directly or indirectly, in the conduct of Canon's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills on a continuous basis for almost seven years seeking payments that Canon was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated, owned and controlled by non-chiropractors and illegally operating; (ii) it engaged in fee-splitting with non-chiropractors; (iii) it engaged in illegal kickback arrangements; and (iv) the billed-for services were provided by independent contractors and not employees of Canon.  A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1."

127.    Canon's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.  The predicate acts of mail fraud are the regular way in which Simakovsky, Anikeyev, Sandler and John Does 1-5 operated Canon, insofar as Canon never has been eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore are essential in order for Canon to function.  Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Canon to the present day.

128.    Canon is engaged in inherently unlawful acts, inasmuch as it's very corporate existence is an unlawful act, considering that it is fraudulently incorporated, owned and controlled by non-acupuncturists, and its existence therefore depends on continuing misrepresentations made to the New York State Department of Education and the New York State Department of State.  Canon likewise is engaged in inherently unlawful acts inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers.  These inherently unlawful acts are taken by GEICO in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

129.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $706,000.00 pursuant to the fraudulent bills submitted by the Defendants through Canon since August 1, 2007.

130.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## THIRD CAUSE OF ACTION
### Against Simakovsky, Anikeyev, Sandler and John Does 1-5
### (Violation of RICO, 18 U.S.C. § 1962(d))

131.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 130 above.

132.    Canon Chiropractic Care, PC is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

133.    Simakovsky, Anikeyev, Sandler and John Does 1-5 are employed by and/or associated with the Canon enterprise.

134.    Simakovsky, Anikeyev, Sandler and John Does 1-5 knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Canon enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills seeking payments that Canon was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated, owned and controlled by non-chiropractors and illegally operating; (ii) it engaged in fee-splitting with non-chiropractors; (iii) it engaged in illegal kickback arrangements; and (iv) the billed-for services were provided by independent contractors and not employees of Canon.  A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1."  Each such mailing was made in furtherance of the mail fraud scheme.

135.     Simakovsky, Anikeyev, Sandler and John Does 1-5 knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

136.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $706,000.00 pursuant to the fraudulent bills submitted by the Defendants through Simakovsky, Anikeyev, Sandler and John Does 1-5.

137.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**FOURTH CAUSE OF ACTION**
**Against Canon, Simakovsky, Anikeyev, Sandler and John Does 1-5**
**(Common Law Fraud)**

138.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 137 above.

139.     Canon, Simakovsky, Anikeyev, Sandler and John Does 1-5 intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent bills seeking payment for chiropractic services.

140.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Canon is properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it is fraudulently incorporated and actually owned and controlled by non-chiropractors; (ii) in every claim, the representation that Canon is properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law §

5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the professional corporation engaged in illegal fee-splitting with non-chiropractors; (iii) in every claim, the representation that Canon is properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the professional corporation engaged in illegal kickback arrangements; and (iv) in virtually all of the claims that the billed-for services were for services provided by employees of Canon, when, in fact, the services were provided by independent contractors and not employees of Canon.

141.   Canon, Simakovsky, Anikeyev, Sandler and John Does 1-5 intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Canon that were not compensable under the No-Fault Laws.

142.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $706,000.00 pursuant to the fraudulent bills submitted by the Defendants through Canon.

143.   The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

144.   Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## FIFTH CAUSE OF ACTION
### Against Canon, Simakovsky, Anikeyev, Sandler and John Does 1-5
### (Unjust Enrichment)

145.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 144 above.

146.     As set forth above, Canon, Simakovsky, Anikeyev, Sandler and John Does 1-5 have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

147.     When GEICO paid the bills and charges submitted by or on behalf of Canon for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

148.     Canon, Simakovsky, Anikeyev, Sandler and John Does 1-5 have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

149.     Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

150.     By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $706,000.00.

## SIXTH CAUSE OF ACTION
### Against Simakovsky, Anikeyev, Sandler and John Does 1-5
### (Violation of RICO, 18 U.S.C. § 1962(c))

151.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 150 above.

152.     Pugsley Chiropractic, P.L.L.C. is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

153.    Simakovsky, Anikeyev, Sandler and John Does 1-5 knowingly have conducted and/or participated, directly or indirectly, in the conduct of Pugsley's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills on a continuous basis for almost six years seeking payments that Pugsley was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated, owned and controlled by non-chiropractors and illegally operating; (ii) it engaged in fee-splitting with non-chiropractors; (iii) it engaged in illegal kickback arrangements; and (iv) the billed-for services were provided by independent contractors and not employees of Pugsley. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2."

154.    Pugsley's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.  The predicate acts of mail fraud are the regular way in which Simakovsky, Anikeyev, Sandler and John Does 1-5 operated Pugsley, insofar as Pugsley never has been eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore are essential in order for Pugsley to function.  Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Canon to the present day.

155.    Pugsley is engaged in inherently unlawful acts, inasmuch as it's very corporate existence is an unlawful act, considering that it is fraudulently incorporated, owned and controlled by non-chiropractors, and its existence therefore depends on continuing

misrepresentations made to the New York State Department of Education and the New York State Department of State. Pugsley likewise is engaged in inherently unlawful acts inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by GEICO in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

156.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $689,000.00 pursuant to the fraudulent bills submitted by the Defendants through Canon since June 30, 2008.

157.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**SIXTH CAUSE OF ACTION**
**Against Simakovsky, Anikeyev, Sandler and John Does 1-5**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

158.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 157 above.

159.   Pugsley Chiropractic, P.L.L.C. is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

160.   Simakovsky, Anikeyev, Sandler and John Does 1-5 are employed by and/or associated with the Canon enterprise.

161.   Simakovsky, Anikeyev, Sandler and John Does 1-5 knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Pugsley enterprise's affairs, through a pattern of racketeering activity consisting of repeated

violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills seeking payments that Pugsley was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated, owned and controlled by non-chiropractors and illegally operating; (ii) it engaged in fee-splitting with non-chiropractors; (iii) it engaged in illegal kickback arrangements; and (iv) the billed-for services were provided by independent contractors and not employees of Pugsley. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2." Each such mailing was made in furtherance of the mail fraud scheme.

162.    Simakovsky, Anikeyev, Sandler and John Does 1-5 knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

163.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $589,000.00 pursuant to the fraudulent bills submitted by the Defendants through Simakovsky, Anikeyev, Sandler and John Does 1-5.

164.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### EIGHTH CAUSE OF ACTION
### Against Pugsley, Simakovsky, Anikeyev, Sandler and John Does 1-5
### (Common Law Fraud)

165.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 164 above.

42

166.    Pugsley, Simakovsky, Anikeyev, Sandler and John Does 1-5 intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent bills seeking payment for chiropractic services.

167.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Canon is properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it is fraudulently incorporated and actually owned and controlled by non-chiropractors; (ii) in every claim, the representation that Pugsley is properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the professional corporation engaged in illegal fee-splitting with non-chiropractors; (iii) in every claim, the representation that Pugsley is properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the professional corporation engaged in illegal kickback arrangements; and (iv) in virtually all of the claims that the billed-for services were for services provided by employees of Pugsley, when, in fact, the services were provided by independent contractors and not employees of Pugsley.

168.    Pugsley, Simakovsky, Anikeyev, Sandler and John Does 1-5 intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Canon that were not compensable under the No-Fault Laws.

169.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $689,000.00 pursuant to the fraudulent bills submitted by the Defendants through Canon.

170.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

171.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## NINTH CAUSE OF ACTION
### Against Canon, Simakovsky, Anikeyev, Sandler and John Does 1-5
### (Unjust Enrichment)

172.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 171 above.

173.    As set forth above, Pugsley, Simakovsky, Anikeyev, Sandler and John Does 1-5 have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

174.    When GEICO paid the bills and charges submitted by or on behalf of Canon for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

175.    Pugsley, Simakovsky, Anikeyev, Sandler and John Does 1-5 have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

176.    Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

177.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $689,000.00.

## JURY DEMAND

178.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury.

**WHEREFORE**, Plaintiffs, Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co., demand that a Judgment be entered in their favor and against the Defendants, as follows:

A.    On the First Cause of Action, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that the PC Defendants have no right to receive payment for any pending bills submitted to GEICO;

B.    On the Second Cause of Action against Simakovsky, Anikeyev, Sandler and John Does 1-5, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $706,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.    On the Third Cause of Action against Simakovsky, Anikeyev, Sandler and John Does 1-5, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $706,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.    On the Fourth Cause of Action against Canon, Simakovsky, Anikeyev, Sandler and John Does 1-5, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $706,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

E.      On the Fifth Cause of Action against Canon, Simakovsky, Anikeyev, Sandler and John Does 1-5, more than $706,000.00, in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

F.      On the Sixth Cause of Action against Simakovsky, Anikeyev, Sandler and John Does 1-5, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $689,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

G.      On the Seventh Cause of Action against Simakovsky, Anikeyev, Sandler and John Does 1-5, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $689,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

H.      On the Eighth Cause of Action against Pugsley, Simakovsky, Anikeyev, Sandler and John Does 1-5, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $689,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

I.      On the Ninth Cause of Action against Pugsley, Simakovsky, Anikeyev, Sandler and John Does 1-5, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $689,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

Dated: June 13, 2014
        Uniondale, New York

RIVKIN RADLER LLP

By: _____

Michael A. Sirignano (MS 5263)
Barry I. Levy (BL 2190)
Ryan Goldberg (RG 7570)
926 RXR Plaza
Uniondale, New York  11556
(516) 357-3000

*Counsel for Plaintiffs, Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co.*

2959885 v2